**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | |
| **v.** | **No. 24-mj-_____-KAR** |
| **RYAN STENWICK,** | |
| **Defendant.** | |

GOVERNMENT'S MEMORANDUM IN SUPPORTS OF ITS
MOTION FOR PRETRIAL DETENTION OF DEFENDANT RYAN STENWICK

The United States of America, by and through its undersigned counsel ("the Government"), respectfully submits this Memorandum in support of its Motion For Pre-Trial Detention Of Defendant Ryan Stenwick.

1.      Preliminary Statement

On December 3, 2024, the defendant Ryan Stenwick ("Stenwick" or "the defendant") was arrested based upon an Indictment filed in the Eastern District of Pennsylvania (Docket No. 24-cr-407) charging him with: (a) one count of cyberstalking in violation of 18 U.S.C. § 2261A(2); (b) two counts of stalking in violation of 18 U.S.C. § 2261A(1), and (c) one count of using fire in commission of a federal felony in violation of 18 U.S.C. § 844(h).

The charges stem from the defendant: (a) forcing a young woman to cut herself and commit depraved sexual acts via a video chat platform while the defendant surreptitiously recorded her; (b) hiring Patrick McGovern-Allen ("McGovern-Allen"),[1] a member of the defendant's criminal

---

[1] In United States v. Patrick McGovern Allen, Docket No. 22-cr-288 (E.D.Pa.), McGovern-Allen pleaded guilty to two counts of cyberstalking and one count of use of fire in commission of a federal felony, and was sentenced to 160 months' incarceration.

organization, to firebomb a juvenile's house; and (c) hiring McGovern-Allen to shoot an occupied

house.

The Government now seeks to detain the defendant pending his transfer to the Eastern

District of Pennsylvania.

    2.      Factual and Procedural History

        a.      Facts

            i.      Background on the Com

These charges involve the defendant's participation in a criminal organization known as

"the Com." The Com operates as a widespread criminal conspiracy.  The object of the conspiracy

is to gain access to protected financial systems through cyber-hacking to steal or extort funds. The

targeted funds are often held as cryptocurrency. The group's cyber intrusions include corporate

intrusions, malware development and deployment, and individual account compromises. The main

goal of these intrusions is to obtain personal information, such as e-mail addresses, passwords,

physical addresses, and phone numbers, that can then be used to steal money or cryptocurrency.

Membership within the Com is predicated upon a willingness to engage in criminal activity

and an ability to assist members in their criminal endeavors. Within the Com, various subgroups

exist organized in hierarchical structures. The subgroups and individuals within the subgroups

coordinate with each other and work collaboratively to maximize profits from their crimes.

Members of the Com also engage in intrusions into telecommunications companies and other

companies to support and facilitate SIM swapping.[2] As a whole, the group is responsible for tens

---

[2] SIM swapping is a type of account takeover fraud that generally exploits weaknesses in authentication mechanisms targeting mobile telephones, allowing criminals to take over a victim's telephone communications. Cyber criminals will generally change the SIM card associated with a victim's account and/or telephone number with a SIM card the criminal controls. Once the SIM card is changed, the criminal controls the victim's telephone number, which then can be used to

of millions of dollars in stolen funds. While the SIM swapping and intrusions seem to be the primary ways that the Com members monetize their criminal activity, members of the Com also protect and promote themselves through intimidation, terror, and violence much like more traditional organized crime groups. These acts of violence often occur in the form of swatting[3] and bricking[4] attacks.

In sum, the group is an international, online criminal organization that steals vast sums of cryptocurrency and commits other criminal conduct. The Com has spawned its own online ecosystem, in which violence, cyber-harassment, extortion, and sexual exploitation is used to further the group's ability to steal, to demonstrate the power of its members, and to increase their reputation within and outside of their community. The defendant is a well-established member of that group.

ii.    The Defendant Cyberstalks K.M.

Count One of the Indictment charges the defendant with cyberstalking K.M., a woman the defendant met through his online activities. Over the course of several months, the defendant engaged in a course of online and "in relief harassment" toward K.M. This included "swatting"

---

reset accounts containing valuable property (such as cryptocurrency accounts) or other valuable information. Many online accounts are secured with authentication features that rely on the user controlling a particular mobile telephone number. Consequently, once a victim's telephone number has been stolen by one of the perpetrators, the perpetrators hijack the accounts that they are targeting.

[3] "Swatting" a residence or institution occurs when an individual contacts 911 anonymously and reports a fake emergency to elicit law enforcement or SWAT Teams to be dispatched to the provided address. This is often done to harass or terrorize the individual(s) at the provided address by having law enforcement arrive at that address under the pretense of encountering a dangerous emergency.

[4] A "bricking" is an incident where a user throws a large rock through a target's window.

3

the victim's home and her family's houses. K.M. had also been victimized by having nude images

of herself distributed without her permission, and the defendant had previously convinced her to

attempt to commit suicide, which resulted in a lengthy hospitalization.

Ultimately, on July 11, 2020, the defendant and another individual forced K.M. to get "on

camera" in a video chat platform. The defendant recorded what happened next, and a 50-minute

video, entitled 2020-07-11 00-53-36.mkv, was recovered from his iCloud account.[5]  In that video,

the defendant and a coconspirator berated the victim, degraded her, and forced her to commit

various depraved acts. These including cutting herself with a razor blade, cutting "R" (for Ryan)

into her thigh, and masturbating with the blood. During the video, Stenwick and his coconspirator

make threats to contact the victim's mother and to swat her[6] in order to exercise control over K.M.

and to force her to harm herself. By the end of the video, K.M. was sobbing and bleeding

extensively, and she was later transported to the hospital.  Further investigation revealed text on

the defendant's phone in which he admits to forcing  K.M. to commit these acts.

        iii.       The Defendant Arranges and Pays for the Firebombing of Juvenile
                  A.R.'s House (Counts 2 and 3)

On December 18, 2021, at approximately 12:30 a.m., McGovern-Allen and another

individual travelled from New Jersey to Abington Township, Pennsylvania because the defendant

hired them to firebomb the house of a female juvenile, A.R., whom the defendant had met through

his activities with the Com. McGovern-Allen and his accomplice smashed a first-floor window on

---

[5] A copy of this video, along with a draft transcript, has been filed under seal and provided
to defense counsel.

[6] Specifically, Stenwick and his coconspirator threaten to "blow [her] doors off." This is a
reference to SWAT teams making forced entry into properties.

the front of the house with a large rock and threw a lit Molotov cocktail striking the window frame.

McGovern-Allen video-recorded the attack as proof that he committed the crime.[7] A screenshot

from the moment the firebomb struck the house is included below:



In the days that followed the firebombing, the video circulated on web applications used

by the Com and among Com members. Stenwick bragged in those messages that he was

responsible for the attack and "spam" posted the messages in various online groups.  His messages

were seen by the intended target of the firebombing, A.R., who previously resided at the home but

was not present on the night of the attack because she had moved to a relative's home to avoid the

---

[7] A copy of this video, entitled Abington.mp4, has been filed under seal and provided to defense counsel.

Com-related harassment.  The night that McGovern-Allen attacked her family's house with an incendiary device, A.R.'s mother and step-father were asleep inside. They awoke to a loud crash and soon after smelled smoke. When firefighters and police officers arrived at the house, they found the front of the house on fire and a shattered bottle near the front window. The fire department extinguished the flames on the front of the house and left.

Three hours later, the fire department returned to the house after the fire reignited. Responding firefighters found heavy smoke throughout the basement and the first floor. Abington Township fire investigators later determined that flammable liquids from the Molotov cocktail and accompanying fire seeped into the house and reignited in air ducts in the basement. The investigators determined the origin of the fire was the precise location where the defendant threw the Molotov cocktail, and the cause of the fire was incendiary. As explained below, investigators connected the defendant to this crime through evidence obtained from the defendant's chats and cryptocurrency tracing.

iv.    The Defendant Arranges and Pays for the Shooting of K.M.'s House (Count 4)

On January 2, 2022, at approximately 2:00 a.m., McGovern-Allen and another individual traveled from New Jersey to Pennsylvania to a house where K.M. was staying.  As described above, K.M. had previously been victimized by members of the Com for years. That night, McGovern-Allen and another individual filmed themselves shooting 8 rounds into K.M.'s house and later posted it on social media platforms regularly used by members of the Com.[8] K.M. and others were inside the house at the time of the incident. The bullets traveled into the home and

---

[8] A copy of this video, entitled 1016 Centre School Shotting.MOV, has been filed with the Court under seal and provided to defense counsel.

were later found in a wall, piano leg, table, and small stool. K.M.'s family reported fearing for their lives during the incident and stated that they remain in fear for their safety.

FBI agents began investigating both the shooting and the firebombing as related acts after learning that they were related to the Com. Investigators gathered evidence that Stenwick had taken credit for the attacks in online forums and began examining cryptocurrency payments made to McGovern-Allen. These payments, which were made just before and just after the firebombing and shooting attacks, were traced from Stenwick's online wallets to McGovern-Allen's online wallets. Additional evidence recovered from Stenwick's iCloud account and chat platforms show him discussing the arrangement for the firebombing and shooting with other members of the Com. In other words, the evidence linking Stenwick to all of the above-described crimes is strong.

        b.      Procedural History

On November 7, 2024, a grand jury sitting in the Eastern District of Pennsylvania returned a four-count indictment charging Stenwick with the crimes described above. On December 3, 2024, FBI agents arrested Stenwick. The Government now moves for detention.

        3.      Legal Standard

The Government moves for Stenwick's detention based upon his risk of flight and his commission of a "felony that is not otherwise a crime of violence that involves a minor victim or that involves the possession or use of a firearm or destructive device." 18 U.S.C. § 3142(f)(1)(E).

Under the Bail Reform Act of 1984, pretrial detention is required if the Court finds that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). The Court must find either (1) by clear and convincing evidence, that the defendant is a danger to the community or (2) by a preponderance of the evidence, that the defendant poses a risk of flight. 18

U.S.C. § 3142(f).

Title 18, United States Code, Section 3142(g) outlines factors permitted to be considered by the Court in determining whether to order pre-trial detention:

> [I]n determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community, [the judicial officer shall] take into account the available information concerning–
>
> (1)  The nature and circumstances of the offense charged . . .;
>
> (2)  the weight of the evidence against the person;
>
> (3)  the history and characteristics of the person, including
>
>> (A)  the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>>
>> (B)  whether, at the time of the current offense or arrest, the person was on probation, on parole or on other release pending trial, sentencing, appeal, or completion of a sentence for an offense under Federal, State, or local law; and
>
> (4)  the nature and seriousness of the danger to any person or the community that would be posed by the person's release . . . .

18 U.S.C. § 3142(g).

At the detention hearing, "the rules concerning admissibility of evidence in criminal trials do not apply to the presentation and consideration of information . . . ." 18 U.S.C. § 3142(f).

4.  <u>The Defendant Should Be Detained</u>

The defendant should be detained because he is both a risk of flight and a danger to the community, and all of the Section 3142(g) factors strongly favor detention.

8

a.      The Offense Is Grave

The "nature and circumstances of the offense charged," including the victimization of a minor female, the use of an incendiary device at an occupied residence, and the discharge of a firearm into another occupied residence, weigh heavily in favor of detention. 18 U.S.C. § 3142(g)(1). The defendant's crimes involve sexual and life-threatening violence. He forced a young woman to commit depraved acts on herself for his amusement. He was able to exercise this power over the victim because he had engaged in a prior course of terrorizing conduct that led to the victim to attempt suicides. Undeterred, the defendant continued to target the victim and make her commit horrific acts as a way to wield his power within the Com.

The defendant's own words, taken from a note recovered on his electronic devices, demonstrate why he is such a danger to the community: "*basically long story short I'm a bad person who doesn't have a problem w making people I dislike attempt suicide but then at the same time I'm a sweetheart and I'm friends w her now and support her thru her mental illness and shit idk I'm just fucked in the head.*"[9]

Even these deplorable acts of sexual violence were not enough for the defendant. He later hired McGovern-Allen to shoot K.M.'s house just days after he hired McGovern-Allen to firebomb A.R.'s residence. These crimes posed the gravest type of danger to the community, and the defendant is frankly fortunate that no one was either burned to death or shot. The nature and circumstances of these offenses weighs clearly in favor of detention.

b.      The Evidence Is Powerful

The "weight of the evidence" is extremely strong and weighs heavily in favor of detention.

---

[9] A copy of this note, entitled Stenwick Notes App.pdf, has been filed with the Court under seal and provided to defense counsel.

18 U.S.C. § 3142(g)(2). As described above, the defendant's own words — both in the form of chats and notes he used to document his feelings about the crime — directly link him to the crimes described above. Additionally, cryptocurrency tracing shows that the defendant used stolen funds to pay for the shooting and firebombing. This direct evidence makes the likelihood of conviction strong, which creates a powerful incentive to flee. This incentive is compounded by the significant sentence that the defendant faces if convicted. He faces a 10-year mandatory minimum sentence under 18 U.S.C. § 844(h), and could face up to life imprisonment under 18 U.S.C. § 2261(b)(4), and 2242(1). An estimated guidelines calculation is as follows:

**Count 1 – Cyberstalking**

| Charge | Enhancements | Points |
|---|---|---|
| 18 U.S.C. § 2261A (Cyberstalking) | Base Offense level, § 2A6.2(c)(1); §2A3.1(a)(2) | 30 |
| | Victim sustained permanent or life-threatening bodily injury § 2A3.1(b)(4) | +4 |
| | | |
| | Total: | 34 |

**Count 2 -Stalking**

| Charge | Enhancements | Points |
|---|---|---|
| 18 U.S.C. § 2261A (Cyberstalking) | Base Offense level, § 2A6.2 | 18 |
| | Offense involves a "possession of threatened use of a dangerous weapon," § 2A6.2(b)(1)(E) | +2 |
| | Total: | 20 |

**Count 3 – Use of Fire in Commission of a Federal Felony**

| Charge | Enhancements | Points |
|---|---|---|
| 18 U.S.C. § 844(h) (Fire – Commission of Federal Felony) | Base Offense level, § 2K1.4 | 20 |
| | Total: | 20 |

**Count 4 - Stalking**

| Charge | Enhancements | Points |
|---|---|---|
| 18 U.S.C. § 2261A (Cyberstalking) | Base Offense level, § 2A6.2 | 18 |
| | Offense involves a "possession of threatened use of a dangerous weapon," § 2A6.2(b)(1)(E) | +2 |
| | Total: | 20 |

After grouping, the total adjusted offense level is 34. Because the defendant does not have a criminal history, his guidelines based upon a total adjusted offense level of 34 and a criminal history category of I are 151-188 months of incarceration.  He also faces a 120-month mandatory minimum sentence on top of these guidelines. The total guidelines calculation is therefore 271-308 months of incarceration. This incredibly serious exposure creates a powerful incentive for the defendant to flee and fail to appear for any court dates in Philadelphia. He should not be afforded that opportunity.

   c.  <u>The Defendant's Personal History Is Concerning</u>

The defendant's "history and characteristics" also favor detention.  18 U.S.C. § 3142(g)(3). Although the defendant does not have a criminal history, he is a part of an organization that commits large-scale cybercrimes and acts of violence. Access to this network gives the defendant access to large sums of wealth and access to cybercriminals around the world. There would simply be no way to prevent the defendant from tapping into his network or to assure his appearance in the Eastern District of Pennsylvania if he were to be released.

   d.  <u>The Defendant's Release Endangers the Community</u>

As described above, the defendant presents the most grave form of danger to the community if released. He has shown an ability to commit both grievous acts of sexual violence and a willingness to hire members of his criminal organization to commit life threatening acts of

violence against people who he believes have wronged him. These victims were known to the

defendant and are still within his reach. They would would be placed in serious risk if he is not

detained. This factor also weighs in favor of detention pending removal to Pennsylvania.

5.      Conclusion

For the preceding reasons, the Government respectfully requests that the defendant be

detained pending his removal to the Eastern District of Pennsylvania.

Respectfully submitted,

JOSHUA S. LEVY
United States Attorney

By:      /s/ Steven H. Breslow
STEVEN H. BRESLOW
(NY2915247)
Assistant U.S. Attorney
300 State Street, Suite 230
Springfield, MA 01105
413-785-0330
steve.breslow@usdoj.gov

**Certificate of Service**

I hereby certify that this document will be filed with the Court and a copy will be sent by
email to Kevin G. Murphy, Esq., who has represented the defendant during the investigation of
the charged offenses.

By:      /s/ Steven H. Breslow
STEVEN H. BRESLOW
Assistant U.S. Attorney

Dated:  December 3, 2024